# UNITED STATES DISTRICT COURT
# DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MARK F. MEDEIROS | ) | |
| | ) | CIVIL ACTION NO.CA 07 425 |
| Plaintiffs | ) | |
| v. | ) | |
| | ) | |
| ROBERT E. JOHNSON, ESQ., LAW OFFICES | ) | |
| HOWARD LEE SCHIFF, P.C., AND CAPITAL | ) | |
| ONE BANK, | ) | |
| Defendants | ) | MARCH 28 2008 |

## AFFIDAVIT OF CHRISTOPHER T. MOYLAN IN SUPPORT OF MOTION TO DISMISS UNDER FED. RULE CIV. PROC. 12(b)(6)

I, CHRISTOPHER T. MOYLAN, DEPOSE AND SAY AS FOLLOWS:

1. I am over the age of 18 and believe in the obligations of an oath.

2. I am the Managing Partner of Law Offices Howard Lee Schiff, P.C., and I am a member of the Connecticut Bar. Our firm is a regional law firm that practices exclusively in the area of creditor's rights, and we have offices in all six of the New England States. Our home office is located in East Hartford, Connecticut, and that is the location to which I regularly report. We also have an office in Providence, Rhode Island, which is regularly staffed by my partner, Attorney Robert E. Johnson, and an associate, Attorney Joseph Hall.

3. I am familiar with the account of Mark E. Medeiros that is the subject of this action. I am familiar with the books and records of our office relating to this case. Our office is committed to compliance with the Fair Debt Collection Practices Act. We have numerous processes and procedures in place to ensure compliance with the Fair Debt Collection Practices Act, as well as other state and federal laws that regulate the practice of law as it pertains to the collection of debt.

4. Robert E. Johnson is admitted to the Rhode Island Bar, and primarily practices law in Rhode

Island office. The documents that are the subject of this action against the plaintiff were produced by our office based upon information and documentation provided by our client, Capital One Bank and under the supervision of Attorney Johnson as well as all of the principal attorneys in our office.

5. Law Offices Howard Lee Schiff, P.C. has no ownership interest in the debt that is the subject of this suit. Robert E. Johnson does not have an ownership interest in the debt that is the subject of this suit. Based upon the information that has been provided to our office, Capital One Bank is the sole and exclusive owner of this debt. It has not been assigned to any other person or entity, including our office and Attorney Johnson. Therefore, Mr. Medeiros' allegations that this Attorney Johnson or Law Offices Howard Lee Schiff, P.C. is the "actual owner" of this debt as set forth in the Third, Fourth, Sixth, Seventh, Eighth, Ninth, Eleventh and Twelfth Counts of the Plaintiff's Complaint are not correct.

6. Medeiros also alleges that the information provided in our "dunning" letters were "false and misleading" because we requested "a lump sum and did not itemize the various charges the compromised the total amount of the debt." First, Second, Fifth, Tenth and Thirteenth Counts of the Plaintiff's Complaint. Each of our letters contained amounts claimed by the plaintiff pursuant to the credit card agreement or by law as follows:

(a) Validation Notice required by 15 U.S.C. §1692g sent to Medeiros on October 7, 2006 showed $3,722.20 as amount due and owing based upon the credit card agreement interest rate claimed by Capital One as due and owing on Medeiros's unpaid credit card balance;

(b) Settlement Letter sent to Medeiros on November 15, 2006 showed $3,771.15--$48.95 more than contained in the Validation Notice—reflecting $1.29 per diem statutory interest at 12% due Medeiros's credit card balance;

(c) Complaint dated November 21, 2006 showed $3,062.67 balance which sum did not include

the credit card agreement interest or statutory interest, but reflected the charge off principal amount of the credit card debt; Complaint also included a request for interest to be awarded by the Court;

(d) Settlement Letter sent to Mr. Medeiros on February 7, 2007 showed $3,293.53 which sum included the charge off principal demanded in the Complaint of $3,062.67, filing fee for District Court action of $60.00, sheriff's fee for serving Complaint of $45.00, and $125.86 in 12% statutory interest from October 7, 2006.

7. Our client, Capital One Bank, provided us with the application for a TJ Maxx credit card that was signed by Mr. Medeiros on October 10, 2001. **Exhibit 1.** The terms and conditions that were agreed upon by the signed application are the standard terms for a Capital One credit card that are sent forth in **Exhibit 2.** Based upon this signed application and the terms of the agreement, Mr. Mr. Medeiros agreed to the terms and conditions of the credit card agreement, including the provisions rating to the payment of interest and other fees in the event of unpaid balances on this account.

8. Capital One referred this claim to our office of October 5, 2006 after Mr. Medeiros defaulted on his agreement to make payments under the credit card agreement. We sent the Validation Notice to Med on October 7, 2007 as the first step to collect this debt. These efforts were not successful, and we therefore commenced suit to recover a judgment against Mr. Medeiros as required by our client. Mr. Medeiros was duly served, but did not answer the Complaint. A default judgment was entered thereafter against Mr. Medeiros. After the issuance of a citation against Mr. Medeiros, our office received a telephone call from Mr. Medeiros on June 28, 2007 wherein he advised that he was not notified of the judgment. He became upset and ended the call. He contacted Attorney Johnson the same day, and requested a continuance of the citation hearing. Attorney Johnson agreed to the continuance.

9. On August 7, 2007, Mr. Medeiros appeared at the citation hearing in District Court, and

requested additional time so that he could speak to an attorney. The hearing was continued to September 4, 2007. At the hearing on September 4, Mr. Medeiros agreed to pay $25 per month beginning on September 25. Mr. Medeiros began making payments to our office of $25 per month, and these payments have been applied to satisfy the judgment.

10. By date of September 21, 2007, Mr. Medeiros sent our office a note requesting that we provide him with the "payment/balance" and indicating that he would be filing suit in federal court. **Exhibit 3.** He called our office on October 29, and claimed that our office broke all kinds of laws and again threatening a federal lawsuit. Mr. Medeiros called our office again on February 21, 2008 demanding Law Offices Howard Lee Schiff, P.C.'s agent for service of process. During the call, he screamed at our staff member claiming he was suing us in federal court, and used profanities in a hostile manner. He then hung up on the employee. We did not learn of this lawsuit until March 4, 2008 when our office was served with the Complaint.

11. Based upon the foregoing, Mr. Medeiros clearly does not honestly dispute that he owes Capital One for this credit card debt. Instead, he claims that the letters sent did not provide him with sufficient information. There is no authority for his claim that this was violation of the FDCPA in light of the fact that each amount claimed due was agreed upon under the terms of the parties' agreement or provided for by law. Therefore, his claims against the firm and Attorney Johnson are ill founded, and the motion to dismiss should be granted.

The foregoing is true and correct to the best of my knowledge and belief.

Dated at East Hartford, Connecticut, the 28th day of March, 2008.

CHRISTOPHER T. MOYLAN
MANAGING PARTNER
LAW OFFICES HOWARD LEE SCHIFF P.C.

STATE OF CONNECTICUT )
) ss: MARCH 28, 2008
COUNTY OF HARTFORD )

Then personally appeared CHRISTOPHER T. MOYLAN, the above-named, and swore to me that the foregoing was true and correct to the best of her knowledge and belief, before me.

NOTARY PUBLIC
~~MY COMMISSION EXPIRES:~~
Commissioner of the Superior Court

**CERTIFICATION OF SERVICE**

I hereby certify that a copy of the foregoing and any attachments hereto were mailed, postage prepaid, this day of MARCH, 2008, to the following counsel of record:

**PLAINTIFF**
MARK E. MEDEIROS
464 EATON STREET
PROVIDENCE, RHODE ISLAND 02908

**COUNSEL FOR DEFENDANT, CAPITAL ONE BANK**
Warren D. Hutchison
LeClairRyan, A Professional Corporation
One International Place, 11th Floor
Boston, MA 02110

/s/____________________
ROBERT E. JOHNSON

THIS COMMUNCIATION IS FROM A DEBT COLLECTOR.

**TRANSFER BALANCES UP TO $20,000.** (See back for details.)

**OFFICER'S SIGNATURE:** [signature] Edmond J. English

To avoid delays, please provide all information requested. Please print clearly in black or blue ink.

☐ Yes ☑ No I would be interested in blank checks.

☐ Yes ☑ No I'm interested in the opportunity to transfer balances to my new account.

How many times in the past 12 months have you shopped at T.J. Maxx, Marshalls, HomeGoods or A.J. Wright?
1. ☑ 0 2. ☐ 1-2 3. ☐ 3-4 4. ☐ 5-6 5. ☐ 7+

I (We) have read the "Important Disclosure Information For Your Credit Card" enclosed that contains important information about rates, fees and other costs of this account and agree to be bound as specified therein. If I (we) have completed the Balance Transfer Request, I have read and agree to the transfer information enclosed.

Signature [signature] Date 1 0 1 0 0 1

Co-Applicant Signature (Both must sign if joint application.) Date

5255-2

1645

Social Security Number
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

Date of Birth
09 12 65

Home Phone
401-725-2406

†Gross Annual Household Income (see Important Disclosures) Check Here If ☐ Retired ☐ Self-Employed
$ 54,600

E-Mail Address (optional)

OPTIONAL
Co-Applicant First and Last Name

Co-Applicant Social Security Number

*Please fold along dotted line and return in enclosed envelope*

5255404511813 003 002

Please cross out and change name and address if necessary.

MARK F. MEDEIROS
184 NEWPORT AVE
PAWTUCKET, RI 02861-4110

EXPIRATION DATE: 10/28/01

**EXHIBIT 1**

M169309

# CUSTOMER AGREEMENT

**Welcome to Capital One.®** We are pleased to have your credit card account. This Customer Agreement contains information about your account. Please read it and keep it for your records. Your contract with us for the card and account ("the Agreement") consists of this Customer Agreement, together with any changes to this Customer Agreement that we make as provided below, the Security Account (if applicable), the Security Account Assignment Agreement (if applicable), Capital One Privacy Notice, any account disclosures provided and delivered to you prior to or at the time your account opened, including disclosures pursuant to requirements of Truth in Lending Act (hereinafter "TILA Account Disclosures"), as well as any subsequent notices of changes to these documents, and any and all documents that include your signature (including any electronic or digital signature) on any application, sales slip or other evidence of indebtedness on your account. In this Agreement the words "you," "your" and "yours" refer to each person who signed the application for the account (each, a "joint accountholder") and to anyone else who is authorized to use the account in any way (each, an "Authorized User"). Except as specifically stated herein, each of you is individually and jointly obligated under this Agreement. The words "we," "us" and "our" mean Capital One, F.S.B. and its successors, assigns, agents and/or authorized representatives. If the application for the account stated that the account will be a "Security Account," this means the funds you have pledged to us to secure your account. This Agreement and the Security Account Assignment Agreement (if applicable) do not apply to any other Capital One, F.S.B. account that you may have, either now or in the future, except as provided in the Arbitration Provision below. Unless you have entered into a Security Account Assignment Agreement with us, the account is unsecured. Except as provided in the Security Account Assignment Agreement (if applicable), the account is not secured by any other property, regardless of the terms of any other contract to which you and we are subject. We can delay enforcing any of our rights under this Agreement without losing them. The card is and remains our property, and you will surrender it to us at any time upon request.

**Assignment.** We may transfer your account, the Security Account (if applicable) the Security Account Assignment Agreement (if applicable) and/or our rights under this Agreement to an assignee. The assignee will take our place under this Agreement, the Security Account (if applicable), and the Security Account Assignment Agreement (if applicable) with respect to the agreements and interests transferred. The assignee may or may not be an affiliate of Capital One, F.S.B. You must pay the assignee and otherwise perform all of your obligations under those agreements. You may not transfer your account or your rights under this Agreement, the Security Account (if applicable) or the Security Account Assignment Agreement (if applicable) to any person or entity without our express prior written consent. Subject to the preceding sentence, this Agreement will be binding and inure to the benefit of your and our respective successors, assigns and representatives.

**Using Your Account.** You can make purchases and obtain cash advances (if cash advances are an option for your account) by using your card, account number and any account access checks (including Purchase Checks, Convenience Checks, Special Transfer Checks and other similar checks) that we may send to you. Additionally, you may request a stop payment on account access checks, but we reserve the right to charge you a fee for such services. When we provide you with account access checks, we will tell you whether they will be treated as purchases, cash advances or special transfers. Unless we tell you otherwise, Convenience Checks will always be treated as cash advances. We may establish different segments for your account, such as a purchase segment, a cash advance segment and a special transfers segment. Each segment may be subject to terms and conditions that are different than those that are applicable to other segments.
Our liability, if any, for any wrongful dishonor of an account access check is limited to your actual damages and shall not include any consequential damages, and in no event will it exceed the amount of the check.
You agree not to use the card or account in connection with any Internet or illegal gambling transactions, but any Internet or illegal gambling transactions in which you engage with the card or account nevertheless will be subject to this Agreement and the Security Account Assignment Agreement (if applicable).
Your card and account may only be used for valid and lawful purposes. If you use, or authorize someone else to use, the card or account for any unlawful or impermissible purpose, you will be responsible for such use and may be required to reimburse us and MasterCard International Incorporated "MasterCard" or Visa USA, Inc. "Visa," as applicable, or their successors for all amounts or expenses that we or they pay as a result of such unlawful or impermissible use. In any event, any unlawful or impermissible transactions in which you engage with the card or account nevertheless will be subject to this Agreement and the Security Account Assignment Agreement (if applicable). You agree that we are not responsible if anyone refuses to honor your card or account.
If you had a prior credit card or other account with us, or such an account or balance of such an account was transferred to us or one of our affiliates, and you agreed to reinstate the balance of the prior account in the form of your new account, the new account will accrue finance charges from the date that the new account is opened.
Authorized users are not financially responsible for the account. An authorized user may use a credit card, can request certain account information and can request to be removed from the account. Subject to our discretion, an authorized user may not be able to initiate certain actions on the account. You agree to provide us with information identifying any persons you authorize to use your account, including their name, address, date of birth and other identifying information we may request.

**Exchange Rate.** If you make a transaction in currency other than U.S. dollars, VISA International or MasterCard International will convert the charge or credit into a U.S. dollar amount in accordance with their operating regulations or conversion procedures in effect at the time the transaction is processed. VISA International's regulations and procedures provide that effective April 2, 2005, the exchange rate between the transaction currency and the billing currency used for processing international transactions is either (1) a rate selected by VISA from the range of acceptable rates in wholesale currency markets for the applicable central processing date, which rate may vary from the rate VISA itself receives or (2) the government mandated rate in effect for the applicable central processing date. MasterCard International's regulations and procedures provide the currency conversion rate it uses is either (1) a wholesale market rate or (2) a government mandated rate in effect on the day of the central processing date.

**Cash Equivalent Transactions.** If cash advances are an option for your account, you can use your account to purchase certain items that we regard as "cash equivalent transactions." All cash equivalent transactions will be treated as cash advances and will be billed to the cash advance segment of your account. Cash equivalent transactions include, without limitation, the purchase of wire transfer money orders, bets, lottery tickets, casino gaming chips and other similar products or services. Nothing in this paragraph will be interpreted to validate any transaction that is unlawful or impermissible.

**Your Credit Limit.** Your initial credit limit will be disclosed when your account is opened (or activated). Either initially, or at any later time, we may establish different credit limits that apply to different segments of your account (such as purchases, cash advances and special transfers). Your current credit limits will be identified in your periodic statements. You agree not to allow the balance of your account (including all transactions, finance charges and other fees or charges), or the balance of the applicable segments of your account, to exceed the applicable credit limits. If you have been given the option to increase your credit limit by adding funds to your Security Account (if applicable), we reserve the right not to increase your credit limit if the additional funds are provided while your account is in default. We may increase or decrease your credit limits at any time without prior notice to you, may temporarily increase or decrease your credit limits at any time without prior notice to you, may limit the credit limit for cash advances or may take away your ability to obtain cash advances. We may honor transactions in excess of your credit limit, even if those transactions result in an over limit fee, and those transactions and fees will be subject to this Agreement and the Security Account Assignment Agreement (if applicable). Any transactions honored in excess of your credit limit will not result in an increase of your credit limit unless we expressly notify you otherwise.

**Additional Benefits and Services.** From time to time, we may offer you benefits and services with your account. These benefits and services may be provided by us or third parties. Unless expressly made a part of this Agreement, and except as provided in the Arbitration Provision below, any such benefits and services are not a part of this Agreement, and are subject only to the terms and conditions outlined in the benefits or services brochure and other official documents provided to you with respect to the benefits and services. We may adjust, add, or delete benefits or services at any time in accordance with the brochures or documents you receive. In addition, any such benefits or services offered to you in the most current version of the "Guide to Benefits" shall replace and supersede the benefits and services that had been offered to you in all previous versions of the "Guide to Benefits," without further notice. Except as provided by applicable law, we are not liable for benefits or services provided by third parties or the actions or omissions of those third parties.

**Making Payments.** You promise to pay us and are liable for all amounts due resulting from the authorized use of your card or account, including any finance charges and other charges due under the terms of this Agreement. Payments must be made in U.S. dollars. Payments made by a check, money order or other negotiable instrument (an "item") must be in a form acceptable to us and be drawn on a U.S. financial institution. We may allocate payments and other credits and proceeds among the various segments of your account, and to charges and principal due within each segment, in any way we determine, including balances (including new transactions) with lower annual percentage rates (APRs) before balances with higher APRs.
Payments you mail to us at the address for payment stated on your periodic statement will be credited to your account as of the business day we receive it, provided (1) you send the remittance coupon portion of your periodic statement and your check in the remittance envelope provided and (2) your payment is received in our processing center by the time indicated on your periodic statement. Please allow at least five (5) business days for postal delivery. Payments received by us at any other location or in any other form may not be credited as of the day we receive them. Our business days are
Monday – Saturday, excluding holidays. Credit availability may be delayed in our sole discretion to ensure payment in good funds. If we accept a payment at some other place, we may delay the crediting of the payment for up to five (5) days. This may cause you to incur late payment fees and additional finance charges, and may result in your account being declared to be in default.
Any minimum payment that is due will be stated in your periodic statement. You must pay at least the minimum payment due by the date stated in your periodic statement to avoid a late payment fee. However, you may pay more than the minimum payment or pay the balance in full. In any case, finance charges will continue to be assessed during billing periods that you carry a balance regardless of whether or not your statement shows a minimum payment due.
We can accept late payments or partial payments, or items marked "payment in full" or other similar language, or payments with a request to apply the payment in a particular manner, without losing any of our rights under this Agreement, including our right to receive payment in full. No payment shall operate as an accord and satisfaction without our prior written approval. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to Capital One, P.O. Box 85010, Richmond, VA 23285-5010. You will not make payments from funds obtained from the account or any other credit account with us. If your payment is made to any other address, we may accept the payment without losing any of our rights.
When you send us check(s) to make payment on your account, you authorize us to make a one-time electronic transfer from your bank account for the amount of the check as indicated by numerical digits. This authorization applies to all check(s) received by us during the billing period even if sent by someone else, who you agree is your agent and was provided with these disclosures in advance. This authorization is not restricted by the date on the check and includes resubmissions. We will not be bound by any restrictive legend or condition appearing on the face or reverse side of the check. If we cannot process the electronic transfer, you authorize us to make a charge against your bank account by processing the check, substitute check, draft or similar instrument.
We may adjust your account as appropriate to correct errors, returned items, rejected debits and similar matters.
We may, in our sole discretion, offer an expedited payment service. You are not required to use this service. When you authorize us to process a demand draft, electronic ACH debit or other expedited payment method for your account, we may charge you an expedited payment fee in an amount disclosed to you at the time of the service. We are not responsible for any dishonor of the payment by your depository institution and may retain the fee in the event of such dishonor.
If you give your account number or other account information to another person to make a payment for you or to act on your behalf, you agree that we may discuss your account with that person and process the payment as if it were made by you. You further agree that you will be responsible for all consequences of payment or non-payment by such party, including expedited payment, return payment, late payment and over limit fees. We reserve the right to refuse to accept payment on your behalf or to permit another person to act on your behalf.

**Periodic Statement.** Each month that you have a credit or debit balance of more than $1 in your account, we will send you a periodic statement as and when required by applicable law. The periodic statement will show all transactions billed to your account during the billing period. The billing period is the time from one statement closing date through and including the next statement closing date. The statement closing date determines the month of a specific billing period. For example, your January billing period is the billing period with the statement closing date in January.

**Finance Charge.** You will be assessed finance charges as previously disclosed to you as part of the TILA Account Disclosures or as we will disclose to you if required by applicable law.

**Temporary Reduction in Finance Charge.** We reserve the right to not assess any or all finance charges for any given billing period without waiving the right to assess such finance charges in a future billing period.

**Other Fees and Charges.** The following fees will be billed to the purchase segment of your account and will be treated as a purchase and applied against your available credit limit, unless otherwise specified, in every billing period in which they apply: (i) A late payment fee will be assessed if we do not receive your

EXHIBIT 2

payment in time for it to be credited, as provided in this Agreement, by the date stated in your periodic statement; (ii) an over limit fee will be assessed if the balance of your account (or any segment of

# EXHIBIT 2

your account) at any time during the billing cycle, for any reason, is greater than the applicable temporary or permanent credit limit, (regardless of whether you went over limit as a result of a transaction, finance charge or any other fee or charge, even if approved by us); (iii) a returned check fee will be assessed if we do not honor any account access check for any reason; (iv) copying charges for duplicate copies of transaction documentation or periodic statements will be assessed on a per-page basis, unless required for billing dispute resolution; (v) a returned payment fee will be assessed if, for any reason, (a) a check, draft or similar instrument is not honored or cannot be processed; or (b) an electronic debit is returned unpaid or cannot be processed. You authorize us to resubmit returned payments in our discretion. At our option, we may assess this fee each time your payment is not honored or paid, even if it is later honored or paid following resubmission. Any check, draft or similar instrument may be collected electronically if returned for insufficient or uncollected funds. We may change any of these fees or charges, or add additional fees and charges, as provided below. We reserve the right to waive any of these fees without prior notification to you while maintaining our right to assess these fees going forward.

**Cash Advance Fee.** If cash advances are permitted for your account, a cash advance fee finance charge will be (i) assessed each time you obtain a cash advance or cash equivalent transaction, (ii) added to the cash advance segment of your account, and (iii) applied against your available credit limit. The amount of the cash advance fee finance charge will be added to other finance charges shown on your periodic statement for the purpose of calculating the annual percentage rate for that billing period. This may cause the annual percentage rate disclosed for that billing period to be greater than the annual percentage rate disclosed to you.

**Membership Fee.** If applicable, a membership fee will be imposed in your first billing period, unless specifically stated otherwise. If the membership fee is assessed annually, it will be assessed in the billing period in which each anniversary of the opening of your account occurs. If the membership fee is assessed monthly, it will be assessed in each billing period. The fee will be billed to the purchase segment of your account and will be treated as a purchase and applied against your available credit limit. The membership fee will not be refunded, in whole or in part, even if you or we cancel the account.

**Transfer Fee.** A fee will be assessed for each transfer of funds from your account to your Security Account that you request. The fee will be billed to the cash advance segment of your account and will be treated as a cash advance and applied against your available credit limit.

**Foreign Transaction Charge.** For each transaction made in a country other than the U.S., or U.S. Territories, we will assess you a finance charge as previously disclosed to you as part of the TILA Account Disclosures or as we will disclose to you if required by applicable law. The fee will be based on the U.S. dollar amount of the transaction.

**Credit Bureau Information.** You agree that we may obtain information about you from credit reporting agencies or others at any time and use it for the purposes of monitoring your credit performance, managing your account and considering you for new offers and programs.

**Security Interest.** The terms and conditions contained within this paragraph apply only if the application for the account stated that the account will be a secured account. You provided us with certain funds, which have been deposited in the Security Account. To secure payment of the balance of the account and all other amounts owing under the terms of this Agreement and the Security Account Assignment Agreement, you have transferred, assigned, pledged and granted to us a security interest in the Security Account, all funds contained in the Security Account, all proceeds of the foregoing and all proceeds of proceeds. This security interest includes, without limitation, the initial funds that were placed into the Security Account, any additional funds added to the Security Account by any person and any interest earned to or accrued on the Security Account. The terms of the security interest are set forth in the Security Account Assignment Agreement you executed. If (i) you default or fail to abide by any of the terms of this Agreement or the Security Account Assignment Agreement, (ii) you close your account or (iii) we cancel your account for any reason, we may then or thereafter, and without prior notice to you, exercise our security interest by deducting from your Security Account the balance due on your account and all other amounts owing under the terms of this Agreement and the Security Account Assignment Agreement. We may exercise this right to make such deductions from your Security Account periodically as we determine to be appropriate. Within sixty days after the date your account is closed, we will send all remaining funds in the Security Account to the person legally entitled to receive them.

**Future Offers.** The terms of any future offer relating to the account will be disclosed to you at the time the offer is made. If you accept an offer, the terms will become effective immediately unless otherwise specified in the offer.

**Default.** We may, in our sole discretion, declare a default under this Agreement if: (a) we do not receive the full amount of any minimum payment on or before the date it is due, (b) you exceed any credit limit or (c) an item used to make payment on your account is not honored or cannot be processed, or an electronic debit to make payment on your account is returned unpaid or cannot be processed. To the extent permitted by applicable law, we may also, in our sole discretion, declare a default under this Agreement if: (1) you violate any of the other terms of this Agreement or Security Account Assignment Agreement (if applicable), (2) we have declared you to be in default under the terms of any other agreement with us or any of our affiliates, or (3) we determine that you made any false or misleading statements on your application for, or regarding the use of, the account, or otherwise attempted to defraud us, (4) bankruptcy or other insolvency proceedings are instituted by you or against you or (5) you die or are declared legally incompetent or incapacitated. At any time following any default under this Agreement (or after we give you any notice or right to cure the default, if required by applicable law), you will be subject to paying interest, finance charges and other fees pursuant to the terms of this Agreement, including any applicable default rate, even after any judgment is obtained. Additionally, we may, at our sole option, (x) limit or not allow you to make any new purchases or cash transactions on your account(s), (y) increase your minimum payment with such notice as may be required by applicable law or (z) subject to the limitations of applicable law, close your account(s) and demand immediate payment of the entire outstanding balance plus all other amounts owing under the terms of this Agreement and the Security Account Assignment Agreement.
To the extent permitted by applicable law, you agree to pay us all of our actual court costs, collection expenses and attorney's fees (whether paid to an attorney who is one of our employees or an attorney who is not one of our employees) incurred by us in the collection of any amount you owe us under this Agreement. You also agree to pay us all of our actual costs that we incur in retrieving your cards, including any costs we may incur by having your account placed on a restricted list. Nothing in this paragraph shall be construed to waive or impede our right to require arbitration in accordance with the Arbitration Provision below.

**Account Closure and Suspension of Credit Privileges.** (1) We may, at any time, with or without cause, with or without advance notice, and regardless of the existence or non-existence of a default under this Agreement, cancel the account and/or temporarily or permanently suspend your credit privileges under this Agreement. If we cancel the account, you agree to immediately destroy all cards and unused account access checks. (2) Your obligation to make payments and your other obligations under this Agreement will continue in full force and effect after the account is cancelled or your credit privileges are temporarily or permanently suspended. Cancellation of the account and/or temporary or permanent suspension of your credit privileges will not affect our security interest in your Security Account (if applicable) or our rights under the Security Account Assignment Agreement (if applicable). You can close your account by calling our Customer Relations department with the number found on the back of your credit card or, if different, the number stated in your periodic statement and requesting an account closure. You agree to destroy all cards and unused account access checks, cancel all preauthorized billing arrangements and cease using your card and account. If you do not cancel all preauthorized billing arrangements, you and we will consider our receipt of a preauthorized debit to your account to constitute your authorization to reopen the account on the terms set forth in this Agreement and the Security Account Assignment Agreement (if applicable). Your account will not be closed until you pay all amounts you owe us under this Agreement and the Security Account Assignment Agreement (if applicable) including, without limitation, any purchase and cash advance transactions you have authorized, finance charges, late payment fees, over limit fees, returned check fees, returned payment fees, membership fees, cash advance fees, transfer fees, copying charges and any other fees charged to your account. You are responsible for these amounts whether they have been incurred at the time you request a closure of the account or they are incurred subsequent to your request to close the account. This may result in charges appearing on your account after you have requested the account to be closed and, if the account has already been closed, the account will be reopened on the terms set forth in this Agreement and the Security Account Assignment Agreement (if applicable). For example, if you authorize a purchase from a merchant and we receive the charge from the merchant after your account has been closed, your account will be reopened, the amount of the charge will be added to your account and you will be responsible for payment under the terms of this Agreement and the Security Account Assignment Agreement (if applicable). The membership fee for your account will continue to be charged, to the extent permitted by applicable law, until the entire account balance has been paid in full, as described above. If the account is reopened, a new membership fee will be charged to the account as stated above.
If you, acting as the primary cardholder, want to terminate a joint accountholder's or an authorized user's access to the account, you must call our Customer Relations department and request that termination. Immediately thereafter, you agree to destroy that person's card(s) and destroy any unused account access checks in that person's possession. There may be a delay in the effective date of the termination of that person's access to the account. The account will be charged, and you and any joint accountholders will be responsible, for any charges through the use of the card or the account by the joint accountholder or authorized user that occur prior to the effective date of the termination even if the charges do not appear on the account until a later time. If you are unable to destroy the joint accountholder's or authorized user's card(s) or to destroy the unused account access checks in that person's possession, and you call our Customer Relations department to close your account, your account will be closed in accordance with the preceding paragraph. Either you and/or the joint cardholder, if any, may apply for a new account.

**Changes in Terms.** We may add to, remove, amend or change any part or provision of this Agreement, including the annual percentage rate(s) and any charges, (including adding new provisions of the same or a different nature as the existing provisions in this Agreement) at any time. If we do so, we will give you notice of such amendment or change if required by Federal law or Virginia law (to the extent not preempted by Federal law) unless we had previously notified the customer that the account would be subject to such amendment or change without notice. Notice will be mailed to the last billing address indicated in our records for the account. However, no notice will be mailed if we previously had notified you that your account would be subject to such amendment or change without notice. Changes to the annual percentage rate(s) will apply to your existing account balance from the effective date of the change, whether or not the account balance includes transactions billed to the account before the change date and whether or not you continue to use the account. Changes to fees and other charges will apply to your account from the effective date of the change.

**Governing Law. WE MAKE THE DECISION TO GRANT CREDIT, OPEN AN ACCOUNT AND ISSUE YOU A CREDIT CARD FROM OUR OFFICES IN VIRGINIA. This Agreement is to be construed in accordance with and governed by the laws of the United States of America and by the internal laws of the Commonwealth of Virginia without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the laws of the United States of America or the internal laws of the Commonwealth of Virginia to the rights and duties of the parties. This Agreement is made in Virginia. It will be governed only by Federal law and Virginia law (to the extent not preempted by Federal law). If a court decides not to enforce a part of this Agreement, this Agreement will then read as if the unenforceable or invalid part were not there, but the remaining parts will remain in effect.**

**Waivers.** You waive the right to receive notice of any waiver or delay or presentment, demand, protest or dishonor and any right you may have to require us to proceed against another party before proceeding against you. You also waive, to the extent permitted by applicable law, any statute of limitations defense for an additional period of time equal to the applicable limitations period.

**Lost or Stolen Cards or Account Access Checks.** If your card(s) or account access checks are lost or stolen or if someone else may be using them without your permission, notify us at once by calling the telephone number on the back of your credit card or, if different, the telephone number shown on the front of your periodic statements, or by writing us at Capital One, P.O. Box 85015, Richmond, VA 23285-5015. You will not be liable in any amount for unauthorized use of your cards or account access checks.
You agree to tell us at once if you change your name, address, telephone number or employment. You agree to give us written notice of any change in your billing address at least 10 days before the change. Changes may be written in the space provided on the remittance coupon portion of your periodic statement or may be sent to the following address: Capital One, P.O. Box 85015, Richmond, VA 23285-5015. If your account is a joint account or if more than one person is permitted to use it, you agree that all notices regarding the account may be sent solely to the address shown on our billing records.

**Communications.** We may release information to others regarding the status or history of your account as set forth in the Capital One Privacy Notice, a copy of which has been provided to you. We may make inquiries of third parties in connection with maintaining and collecting your account, and you authorize such third parties to release information about you to us. We or our representatives may contact you from time to time regarding the account, or to ask for additional information about you or your experience with Capital One. You agree that such contacts are not unsolicited, are not limited except as expressly required by applicable law and may result from contact information you have provided or that is obtained from other sources. For example, we may contact you at your home or place of employment, during weekends or holidays, on your mobile telephone, voicemail or answering machine, and by email, fax, recorded message, text message or personal visit. Except as restricted by applicable law, we may monitor or record any calls we make or receive, suppress caller identification services and use an automated dialing and announcing device.

**ARBITRATION. PLEASE SEE ENCLOSED "ARBITRATION PROVISION." PLEASE NOTE THAT THE TERMS INCLUDED IN THE ARBITRATION PROVISION ARE PART OF YOUR CUSTOMER AGREEMENT.**

© 2005 Capital One Services, Inc. Capital One is a federally registered service mark. All rights reserved.

# EXHIBIT 2

im649309

EXUBERA®
(i...lin human [rDNA origin])
Inhalation Powder

PLEASE PROVIDE ME
WITH PAYMENT/BALANCE
STATEMENT MONTHLY.
I'LL BE SEEING YOU IN
FEDERAL COURT.

MFM

Exhibit 3